**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
*Norfolk Division*

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:22cr66** |
| | ) | |
| **CHARLES W. JONES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S POSITION WITH RESPECT TO SENTENCING

COMES NOW the defendant, Charles Jones, by counsel, in accordance with Rule 32 of the Federal Rules of Criminal Procedure, § 6A1.2 of the *Sentencing Guidelines and Policy Statements* as well as this court's Sentencing Procedures Order and offers his position with respect to sentencing. Mr. Jones has reviewed the U. S. Probation Officer's Presentence Investigation Report and has no objections that would affect the calculation of the sentencing guidelines. However, Mr. Jones does respectfully object to a factual statement included in the report.

## OBJECTION TO THE PRESENTENCE REPORT

Mr. Jones, through counsel, has previously advised the probation office and the government that he objects to the factual statement in paragraph nine of the presentence report that "Jones approached Jennifer Strickland and demanded bribe payments from her". The claim by Strickland, that Jones demanded payments, was made when she was being questioned by the investigators. That was after Ms. Strickland learned that she was the target of a criminal investigation; that there was overwhelming evidence against her; and that much of that evidence came as a result of Mr. Jones accepting responsibility for his own wrongdoing and then truthfully

assisting the government in its investigation. Mr. Jones was unaware of the claim by Ms.
Strickland that she was forced into cooperating and, therefore, had no opportunity to address it
previously.

The Statement of Facts in Ms. Strickland's case,  sworn to by Ms. Strickland after she and
her most able counsel had the opportunity to review and to shape that important document, says
nothing of demands or any sort of coercion employed by Mr. Jones. "C.J. (Charles Jones) and
Strickland **agreed** that C.J. would recommend SDC (Strickland's company) to be awarded GSA-
funded construction projects. In exchange, Strickland agreed to pay C.J…". Strickland ECF 11,
¶ 4. Strickland did "give, offer, and promise a thing of value to [Jones] **to induce him** to act in
violation of his lawful duties". Id P7. (Emphasis added)  Those statements are true.

The defendant does not make this objection to minimize his conduct or his culpability. He
has not lost sight of the big picture. Mr. Jones acknowledges that he was in a superior position to
Ms. Strickland in terms of his ability to influence the award of government contracts. He
acknowledges that he is the most culpable party.  He had an obligation to not only refrain from
the conduct in which he engaged, but to guard against it. He will stand before this court to be
sentenced for his choices. However, it is equally important that the court has an accurate
understanding of how these acts occurred in order to hand down a fair and appropriate sentence.
Ms. Strickland participated in this scheme for her own financial gain and is not entitled to
characterize it differently in order to benefit herself.

Furthermore, to rebut this notion that Jones coerced Strickland, the government is aware
that after entering into this relationship, Strickland did not always use subcontractor Daniel
Crowe on contracts for which Jones had recommended him. Mr. Jones never demanded that

Strickland change that decision, even though doing so might have resulted in additional financial gain. Mr. Jones respectfully submits that he engaged in acts for which he unreservedly accepts responsibility and for which he is greatly ashamed. He can only ask that this Court's sentencing decision be based on an accurate understanding of the facts supported by the evidence.

## STATUTORY AND GUIDELINE OVERVIEW

Mr. Jones comes before the court for sentencing on one count of Bribery of a Public Official in violation of 18 U.S.C. 201(b)(2)(c). He faces a maximum term of 15 years imprisonment, a fine, and up to 3 years of supervised release. The United States probation office has calculated an advisory guidelines range of 108-135. Mr. Jones has cooperated with the United States in its investigation of these events since 2019, has been debriefed over many hours on various dates and actively participated by recording a meeting with a co-defendant under the direction of investigators.  Mr. Jones anticipates that the government will file a motion for downward departure pursuant to § 5K1:1 of the United States Sentencing Guidelines for his substantial assistance and will recommend a sentence reduction of 50%.  Mr. Jones respectfully submits that there are significant factors which justify an additional variance which will yield a sentence which is sufficient but not greater than necessary to accomplish the goals of sentencing.

## STANDARDS GOVERNING SENTENCING

After *United States v. Booker*, 543 U.S. 220 (2005), the Federal Sentencing Guidelines are advisory and courts of appeals review sentences for reasonableness.  See *United States v. Hughes,* 401 F.3d 540, 546-47 (4th Cir. 2005).  In *Rita v. United States*, 127 S.Ct. 2456 (2007) the Supreme Court stated that a district court should begin all sentencing proceedings by correctly calculating the applicable Guideline range.  The district court must then consider all of

the factors listed in § 3553(a) and determine if they support the sentence requested by a party. "In so doing, [the judge] may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38 (2007) (citing, *Rita*). "It has been uniform and constant in the federal judicial tradition for the sentencing judge *to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate*, sometimes magnify, the crime and the punishment to ensue." *Id.* [citing *Koon v. United States,* 518 U.S. 81, 113 (1996) (emphasis added)]. Indeed, the Court in *Gall* rejected a rule that required "extraordinary circumstances" be found to impose a sentence outside of the guidelines. *Gall*, 552 at 47.

The statutory factors that must be considered in determining a just sentence include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the Guidelines range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the following: the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. See 18 U.S.C. § 3553(a).

The primary directive of § 3553(a) is to "impose a sentence sufficient, but not great than necessary, to comply with the purposes" of sentencing. A sentencing court must therefore impose the minimally sufficient sentence that accomplishes the statutory purposes of sentencing.

Sentencing courts may vary from the advisory guidelines based solely on disagreements with the policy considerations underlying the guidelines in a case. *Kimbrough v. United States*,

552 U.S. 85, 101 (2007).  In other words, the Guidelines are only the starting point and the initial benchmark in determining a sentence and sentencing judges "must make an individualized assessment based on the facts presented." *Gall*, 552 U. S. at 49-50.

## HISTORY AND CHARACTERISTICS

Mr. Jones is 60 years old. He is the oldest of three boys.  In his early childhood there were great challenges. The family moved when his father sought employment and his mother had to return to work. The defendant became responsible for overseeing and helping to raise his two younger brothers. Mr. Jones' parents divorced when he was 10 years old and there were even more demands and responsibilities placed on Mr. Jones. His mother worked full-time and he did much of the cooking for his brothers, ensured that they made it to school every day, defended them from bullies and taught them how to conduct themselves. (Ex 1 - Letter of R Jones and Ex 2 - Letter of T. Jones) Mr. Jones also helped his father in his work and learned to work hard. He began to learn plumbing from his father at age 12. Tragically, Mr. Jones's mother, who suffered from depression and alcoholism, died in a house fire.

Mr. Jones graduated from high school in 1981 and immediately enlisted in the Navy. When the Marine barracks in Beirut were bombed in 1983, Chuck became involved in the rescue and recovery of those Marine victims. In the Navy commendation letter citing his service from May through December 1983 in support of the multinational force in Lebanon, Mr. Jones is commended for his diligence and outstanding resourcefulness that inspired all of those around him to greater efforts. His "professionalism and loyal devotion to duty reflected great credit upon himself and the United States" Navy. (Ex 3 - Navy Citations)  However, that devotion to duty came with a cost. Mr. Jones would later be diagnosed and continues to suffer with PTSD, major

depression and anxiety disorder which a treatment provider explains was a direct result of the defendant's military service which included rescue and recovery efforts following the bombing of the Marine barracks. A longtime friend who served with Mr. Jones in the Navy wrote that Mr. Jones was part of the first working party ashore on the day of the bombing and he spent days saving the lives of Marines trapped in the rubble and recovering the bodies of the fallen to return to their families. He observed that those events scarred Chuck and have continued to cause him to regress and become reclusive. (Ex 4 - Letter of J. Potunas) Mr. Jones continues to suffer from flashbacks and nightmares as documented in medical records and reports offered together with this pleading. (Ex 5).

Mr. Jones has always worked since leaving the Navy. He is devoted to his family, friends and community. He is described unfailingly as giving and generous with his time and talents. Neighbors describe themselves as fortunate to live next door to a man with such a giving heart and grateful for his presence in their lives. Mr. Jones is the local handyman, always available to help with anything that his neighbors need. That included everything from home repairs to assisting with elderly parents. Jennifer Patton offers in her letter to the court that she has known Mr. Jones her entire life. She describes him as generous and giving in assisting Ms. Patton and her husband as well as her elderly parents. (Ex 6 - Letter of J. Patton) Melissa Druff has been a neighbor of Mr. Jones for some 15 years. She describes him as polite and respectful, a good and decent citizen. Mr. Jones admitted to Ms. Druff his conduct which has led to this prosecution for which she believes he is very remorseful. (Ex 7 - Letter of M. Druff). Diane Kincaid, a neighbor or many years, describes Mr. Jones as a helpful friend who considers herself fortunate to live next door to a man with a servant's heart. (Ex 8 - Letter of D. Kincaid).

-6-

So many of Mr. Jones' friends have expressed shock upon learning of his criminal conduct to which he has humbly admitted.  His reputation in his community is that of an honorable man and a good citizen.  Even after admitting to his friends and neighbors that he had accepted illegal bribes, another neighbor nevertheless describes Mr. Jones as a fine man for whom they are grateful to have in their lives and in their community.  (Ex 9 - Letter of M. Cimorelli and Ex 10 - Letter of J. Vance).

Mr. Jones' involvement in this scheme was not motivated by a desire to live a lavish or extravagant lifestyle.  Rather, it was in large part the pressure he put on himself to provide for his family.  Mr. Jones' father is elderly and suffers from serious and debilitating physical and medical conditions which he describes in his own letter to the court.  Mr. Jones moved to be closer to his father to assist him, including providing transportation to his many medical appointments, overseeing his father's medications and communicating with his fathers' physicians.  Mr. Jones' father writes that he was shocked to learn about his son's case.  "The man I raised has. . . proven himself to be a caring individual with a strong work ethic and a man of high character.  Perhaps the strain put on him during the last few years encouraged his behavior.  Chuck is the only one that I am able to consistently rely on. . . I know that on the other side of this case awaits a Godly man who is honest, honorable and continues to help his family in any way he can."  (Ex 11 - Letter of Chuck Jones, Sr. and Ex 12 - Letter of defendant, Charles Jones)

Mr. Jones' son writes to describe the love that he and his family have for Mr. Jones and the joy he brings when he is with his grandchildren.  Mr. Jones' son also describes how his father's financial support made his own journey a success and helped to fulfill his own dreams.  Mr. Jones helped his son with a down payment on a house in 2017 so that he and his wife could

move out of a dangerous neighborhood.  He also paid for his son to return to college in 2018 so that he could earn his degree.  (Ex 13 - Letter of Charles Jones, III).

Mr. Jones assisted his daughter in college when she needed help with rent and a car following a serious car accident.  But more importantly, they have worked on repairing a complicated relationship.  (Ex 14 -  Letter of Lindsay Milazzo).

Mr. Jones' wife, Wendy, writes in her letter to the court that she and Chuck have been together since 2004.  She was a single mother with a seven-year-old daughter.  Mr. Jones raised her as his own.  He was patient and giving.  Together with his wife, Mr. Jones  provides irreplaceable support and care for Wendy's 82 year old mother, Cordia Alsup.  Ms. Alsup is suffering from terminal kidney disease.  She is legally blind, has suffered from past strokes and heart attacks but has insisted on continuing to live in her own home.  She has refused efforts by her daughter and son-in-law to bring in professionals to assist her in her home.  Mrs. Jones can no longer rely on her brother to assist with the care of their mother.  He recently left their mother unattended and she got into a car to drive herself. She was found by police after having driven into a tree.  That police report is attached.  Mr. Jones spends much of his life now traveling between his father's home and the home of his mother-in-law to care for them.  (Ex 15 - Letter of Wendy Jones, Medical Records of C. Alsup, Police Incident Report).

Mr. Jones is also diagnosed with medical and mental health conditions.  He receives treatment and medication to address heart disease, hypertension and migraine headaches.  In connection with his past military service, Mr. Jones suffers from chronic Post Traumatic Stress Disorder, Major Depression and Anxiety Disorder which still causes flashbacks and nightmares despite years of treatment through the Veterans Administration.

## APPLICATION OF THE § 3553 SENTENCING FACTORS
## IN SUPPORT OF A DOWNWARD DEPARTURE OR VARIANT SENTENCE

Mr. Jones appreciates that the government has acknowledged his substantial assistance in filing the 5K Motion recommending a sentence reduction.  However, there are additional and significant factors which, although not relevant to the court's analysis of the 5K motion, do justify an additional variance.  The factors which the court is to consider in the context of a motion under USSG § 5K1.1 include: (1) the court's evaluation of the significance and usefulness of the defendant's assistance; (2) the truthfulness, completeness and reliability of information provided by the defendant, (3) the nature and extent of the defendant' assistance, (4) any injury suffered, or any danger or risk of injury to the defendant or his family, and (5) the timeliness of the defendant's assistance.  *U. S. v. Hood*, 556 F. 3d 226 (4th Cir. 2009) cert denied, 558 U.S. 921 (2011).  The defendant's personal history and characteristics are not relevant factors.

Pursuant to 18 U.S.C. § 3553(a), the sentencing court is directed to impose a sentence that is sufficient, but not great than necessary to achieve the goals set forth by Congress, including the imposition of a just punishment. § 5K2.0 of the Sentencing Guidelines establishes that a court may depart if there exists aggravating or mitigating circumstances of a kind or to a degree, not adequately taken into consideration by the Sentencing Commission that should result in a sentence different from one within the applicable guidelines range.  The facts and arguments which support a traditional downward departure likewise support a variance sentence in Mr. Jones' case.  A sentence below the guidelines is appropriate under  § 5H1.6 (Family Ties and Responsibilities), § 5H1.3 (Mental and Emotion Conditions), and § 5H1.1 (Age).

-9-

U.S.S.G. §5H1.6 states that "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted".

> In determining whether a departure is warranted under this policy statement, a new application note instructs the court to consider the seriousness of the offense; the involvement in the offense, if any, of members of the defendant's family; and the danger, if any to members of the defendant's immediate family member as a result of the offense.

> In addition to considering those factors, the amendment further restricts family ties departures by adding an application note that establishes heightened criteria for departures based on loss of caretaking or financial support. In such cases, the court must find all of the following four circumstances: (**1**) That a sentence within the applicable guidelines range will cause a substantial, direct and specific loss of essential caretaking or essential financial support to the defendant's family; (**2**) that such loss exceeds the harm ordinarily incident to incarceration; (**3**) that there are no effective remedial or ameliorative programs reasonably available, making the defendant's caretaking or financial support irreplaceable to the defendant's family; and (**4**) that the departure effectively will address the loss of caretaking or financial support. The Commission determined that these heightened criteria are appropriate and necessary in order to distinguish hardship or suffering that is ordinarily incident to incarceration from that which is exceptional.

U.S.S.G. §5H1.6 cmt n.l.

In conducting the required analysis, the Fourth Circuit, as well as courts across the country, have noted that it is "beyond doubt that circumstances could exist in which unique family responsibilities might justify a downward departure." *United States v. Brand*, 907 F.2d 31 (4th Cir.), cert denied, 498 U.S. 1014, 111 S.Ct. 585, 112 L. Ed. 29 (1990). In *United States v. Spedden*, 917 F. Supp. 404 (E.D. Va 1996), the defendant pled guilty to a one-count Criminal Information charging wire fraud. The Guidelines sentencing range was 12 to 18 months incarceration. The court sentenced the defendant to 12 months of home confinement. In that case, the defendant was the manager of an Office Depot store who made fraudulent returns of merchandise credits for approximately $58,000.00 worth of merchandise. In his personal life, the

defendant was 30 years old, married and had children.  His wife and 9 year old daughter had life threatening illnesses.  The defendant's wife was diagnosed with ovarian cancer and required surgery.  His daughter had a rare, life threatening disease, Scleroderma, and was receiving extensive medical treatment.  The court acknowledged in its opinion that "the Fourth Circuit has construed downward departures based on family times very narrowly. E.g., *United States v. Bell*, 874 F. 2d 537, 538 (4th Cir. 1992) (holding that the possible destruction of a family caused by the extended incarceration of the family's sole earner was not extraordinary)". *Id* at 407. However, the Court in *Spedden* found that the defendant's case was distinguished from the "heartland" because it was not that the normal, every day course of the defendant's parental relationship would be disturbed if he was incarcerated, but rather, there was the realistic possibility of the death of the defendant's family members during the defendant's incarceration because he would be unable to provide any day-to-day assistance to sustain his family.  *Id.* at 408.  "This Court finds that the medical hardships of defendant's family constitutes the extraordinary rare case to such an unusual degree that a downward departure is justified." *Id.* at 409.

In *United States v. Velez*, 249 F. Supp. 2d 716 (E.D. Va. 2002), the defendant pled guilty to one count of conspiracy to commit extortion.  The Sentencing Guidelines range was 24 to 30 months.  The court granted a downward departure and decreased the defendant's adjusted offense level by 4 levels to level 13 with a Guidelines range of 12 - 18 months.  The court sentenced the defendant to 12 months, to be served in home confinement.  The defendant's wife had been diagnosed with a cancer requiring a biopsy and subsequent radiation therapy and chemotherapy.  Ms. Velez also suffered from clinical depression and post-traumatic stress disorder.  She would

be unable to afford necessary medical care if they lost her husband's insurance benefits while imprisoned. The court acknowledged that the defendant's circumstances fell into the "Family Ties and Responsibilities" section of the Guidelines and are classified as a "discouraged basis for departure."  Nevertheless, the court held that these circumstances were exceptional and that a departure from the Guidelines was warranted.  *Id* at 722.

In *United States v. Colp,* 249 F. Supp. 2d 740 (E.D. Va 2003), the defendant was convicted of one count of income tax evasion.  The Guidelines called for a sentencing range of 10 to 16 months.  The defendant moved for a downward departure based on family circumstances.  The court found that a departure was appropriate and adjusted the offense level to a Guidelines range that called for 0 - 6 months.  The defendant was placed on probation which included 3 months of home confinement.  In *Colp*, the Defendant's husband suffered from a traumatic brain injury and nerve damage which caused cognitive defects, seizure disorder and incontinence.  He required close supervision for safety and for medications which his wife provided.  The defendant provided constant care for her husband, arranging her work schedule so that she could prepare his meals, administer his medications and be present for all therapies.

The court noted that such circumstances are classified as a discouraged basis for departure but found that the circumstances here were exceptional and that the defendant should be allowed to provide the care her disabled husband required.  "It goes without saying that nursing home care at government taxpayer expense is an option where there is no humane way to provide for a loved one in extreme need.  The fact that such an option may be available is not evidence that the circumstances here are not extraordinary because most citizens, if given a choice between being shunted off by society to an institutional nursing home at taxpayer expense

versus being cared for by a loving spouse in your own home without cost to the taxpayer, would select home care with a spouse." *Id.* footnote 2.

In *United States v. Husein*, 478 F. 3d 318 (6th Circuit 2007), the defendant pled guilty to three charges, including conspiracy to distribute ecstasy. The advisory Guideline range was 37 - 46 months. The defendant moved for a downward departure based on extraordinary family circumstances. Ms. Husein, who was 25 years old, lived in her parents' home with three minor siblings. Her father was totally incapacitated following several strokes and required dialysis to treat chronic kidney failure. The defendant and her mother provided for all of the family's needs and alternated working shifts to ensure that an adult was always home to attend to her father and the minor children. The district court concluded that the defendant "presented sufficient facts to warrant a departure under [U.S.S.G. §] 5H1.6" and imposed a non-custodial sentence of 3 years supervised release, which included a term of home confinement of 270 days. *Id.* at 324. The Court of Appeals found that the sentencing court did not abuse its discretion and affirmed the judgment. The court, in its opinion, pointed out that defendant Husein argued that she was entitled to a non-custodial sentence with or without a downward departure under § 5H1.6. The court agreed. "Post-Booker case law confirms Husein's understanding that family circumstances can form the basis of either a Guidelines-authorized departure or a non-Guidelines, § 3553(a) - based departure, also known as a variance. (internal citations omitted)." *Id* at 330.

Although Mr. Jones has siblings and a step-mother, he has been the essential caretaker for his father. No other family members have been able or available to meet the needs of Mr. Jones' father. Other family members cannot provide the care, supervision and assistance needed if he is incarcerated. The care which Mr. Jones provides for his father is irreplaceable and his absence

presents a very real possibility of "life-threatening consequences". The loss of essential caretaking is a factor to be considered and supports either a departure under section § 5H1.6 or a variance sentence.  The care that Mr. Jones provides for his mother-in-law is also vital and irreplaceable.  His wife simply cannot do it all on her own.  Mr. Jones respectfully submits that this mitigating circumstance is of a kind not adequately taken into consideration by the sentencing guidelines and does justify a downward departure.

Mr. Jones' age when considered together with his medical and mental health conditions support a below guidelines sentence. The Federal Sentencing Guidelines, as originally promulgated in 1987, provided that an individual's age, health or mental health was "not ordinarily relevant" in determining whether a sentence should be outside the applicable guideline range.  The Supreme Court effectively ended these limitations in *United States v. Booker*, 543 U.S. 220 (2005) and the Guidelines were amended as of November 1, 2010 to provide that age, physical condition and mental health may be relevant.  *See* U.S.S.G. § 5H1.1 (age), 5H1.3 (mental and emotional and conditions), 5H1.4 (physical condition) (November 1, 2012).

The National Institute of Corrections defines prisoners fifty and older as "elderly" and "aging."  *See* Dr. Joann B. Morton, *An Administrative Overview of the Older Inmate*, U.S. Department of Justice, National Institute of Corrections, 4 (1992).  *See* also *United States v. White,* 506 F. 3d 635, 640 (8th Cir. 2007)(a defendant's age at 51 can and should be considered in sentencing.)  Because incarceration can be substantially more punitive for an older defendant than the "heartland" offender, sentencing leniency based on older age promotes the penal goals of imposing sufficient punishment and avoiding unwarranted sentencing disparities under 18 U.S.C. § 3553.  Older prisoners, even if they are not suffering illness, can find the ordinary rigors of

-14-

prison particularly difficult because of a general decline in physical and often mental functioning which affects how they live in their environments and what they need to be healthy, safe, and have a sense of well-being.  *See* Human Rights Watch, *Old Behind Bars - the Aging Prison Population in the United States,* at 7 (January 2012).

The justification for considering an inmate's age is based on the fact that prison facilities rules and routines were not created with older inmates in mind.  As a result, ordinary incidents of prison life may challenge those who are only considered middle-aged in the community at large. These include climbing stairs to high tier cell blocks, getting into a top bunk with a low ceiling, walking long distances for meals and other services, standing in long lines for meals or pills, sleeping on thin mattresses, and enduring cold and hot temperatures.

Ordinary incidents of aging present special health risks to older prisoners.  Among other things, older inmate are more vulnerable to contagious diseases, face increased risk of falls, require more frequent access to toilet facilities, and require more prescription medications.  *See An Administrative Overview* at 1 - 10 .  They are particularly vulnerable to the effects of over or under medicating, and suffer disproportionately from a poor diet and limited exercise.  *Id.*

Even if the Bureau of Prisons could provide adequate care for an aged defendant, this "misses the mark" when it comes to sentencing because the issue under § 3553 is the need to provide medical care "in the most effective manner."  *United States v. Wadena*, 470 F. 3d, 735, 739 (8th Cir. 2006).

Any prison term is a larger portion of an older defendant's remaining years than it is for the "heartland" offender's.  Therefore, an older defendant's shorter life expectancy supports

leniency based on the sentencing goals of proportionality and avoiding unwarranted sentencing disparities.

## THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES

These are many reasons provided in the Presentence Report and the letters and other exhibits submitted on behalf of Mr. Jones which support a considerable downward variance in this case.  But there is no more compelling reason than the requirement than the court should avoid unwarranted sentencing disparities.  Here the court need look no farther than the sentences handed down in the cases of Mr. Jones' co-defendants.  Undoubtedly, Mr. Jones as the representative of the United States General Service Administration (GSA), bears the greatest culpability.  Daniel Crowe and Jennifer Strickland are not victims.  They were not reluctant participants.  They were partners who acted out of self-interest.  Co-Defendant Daniel Crow willingly entered into this arrangement.  He and his companies were paid millions of dollars for the contracts he received and performed.  He was sentenced to 8 months incarceration.

Jennifer Strickland likewise entered into this relationship with Mr. Jones for her personal gain and was awarded a contract worth more than $1.3 million dollars.  She was sentenced to 36 months probation with 18 months of Home Electronic Monitoring.  In this case even a proper application of the sentencing guidelines and the recommendation from the government in its 5K motion would result in a grotesque sentencing disparity and a result which is far great than necessary to accomplish the purposes of sentencing set forth by Congress.

## THE NEED TO AFFORD ADEQUATE DETERRENCE AND
## PROMOTE RESPECT FOR THE LAW

While the Court most impose a sentence that affords adequate deterrence to criminal conduct, a lengthy term of imprisonment is not necessary in this case to accomplish that goal. Mr. Jones committed this offense while working for an agency of the United States Government. He was fired from that position and will never return to government employment.  Mr. Jones is 60 years old.  He is married, has a strong family and community support system, access to medical and mental health care, and has accepted responsibility for his crime.  Mr. Jones' offense is serious and he accepts that there must be punishment.  However, it does not follow that a longer sentence will provide a greater deterrent effect.

Research indicates that increases in the severity of punishment are far less important to producing deterrent effects than the certainty of punishment. *See* Wright, *Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment.*

Indeed, virtually no empirical data suggests that harsher (more lengthy) sentences achieve better general deterrence than moderate sentences. After reviewing the available evidence on whether harsher sentences deter, professionals have asked and answered the following question:

> Can we conclude that variation in the severity of sentences would have differential (general) deterrent effects? Our reply is a resounding no. We could find no conclusive evidence that supports the hypothesis that harsher sentences reduce crime through the mechanism of general deterrence. Particularly given the significant body of literature from which this conclusion is based, the consistency of the findings over time and space, and the multiple measures and methods employed in the research conducted, we would suggest that a stronger conclusion is warranted. More specifically, the null hypothesis that variation in sentence severity does not cause variation in crime rates should be accepted.

Anthony N. Doob and Cheryl Marie Webster, *Sentence Severity and Crime: Accepting the Null Hypothesis*, 30 Crime & Just. 143, 147 (2003). Indeed, "[t]he findings regarding general deterrence are relatively settled":

> The existing data show that in the absence of the threat of punishment for criminal conduct, the social fabric of society would readily dissipate; crime would escalate and overwhelmingly frustrate the capacity of people to lead happy and fulfilled lives. Thus, general deterrence works in the absolute sense: there is *a connection* between criminal sanctions and criminal conduct. However, there is insufficient evidence to support a direct correlation between higher penalties and a reduction in the crime rate...It is counter-intuitive to suggest that higher penalties will not reduce the crime rate.  However, the evidence is relative definitive.

Mirko Bagaric, *A Rational Theory of Mitigation and Aggravation in Sentencing: Why Less is More When it Comes to Punishing Criminals*, 62 Buff.L.Rev. 1159, 1202-1203 (2014) (footnotes omitted). In sum, "studies show that awareness of potentially severe sanctions does not produce less crime" *Id.,* at 1203. So, general deterrence "does not require a particularly burdensome penalty, merely one that people would seek to avoid," which "could be satisfied by a fine or a short prison term." *Id.*, at 1205.

It is also important to consider that the collateral consequences of Mr. Jones' conviction will have a powerful deterrent impact.  He is now a convicted felon and has already suffered significant financial consequences as a result of his conduct including his loss of his government employment and benefits.  The government has already seized over $95,000.00 which Mr. Jones has agreed to forfeit.  He will also pay over $30,000.00 to satisfy his obligation under his plea agreement.  Mr. Jones has filed an amended tax return and entered into a payment plan with the IRS for which he makes regular payments.  (Ex 16 -

Transcript from IRS) The loss of his job and reputation together with the significant financial consequences already visited upon Mr. Jones reflects the seriousness of this crime and promotes respect for the law.

The Guidelines' "most fundamental flaw is the notion that the complexity of human character and conduct can be rationally reduced to some arithmetic formula."[1] This is especially true in white collar and tax cases, where the sentencing range is largely determined by escalating loss enhancements pursuant to USSG §§ 2B1.1 and 2T1.1, an increasingly criticized approach that usually results in draconian advisory Guidelines. *See, e.g., United States v. Adelson,* 441 F. Supp 2d 506, 512 (S.D.N.Y. 2006) (describing "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense.") *See also United States v. Parris,* 573 F. Supp 2d 745, 754 (E.D.N.Y. 2008) (noting that despite the fact that the Guidelines "reflect Congress' judgment as to the appropriate national policy for such crimes. . . this does not mean that the Sentencing Guidelines for white-collar crimes should be a black stain on common sense" and sentencing defendant "to a term of incarceration of 60 months in the face of an advisory guidelines range of 360 to life.").

Furthermore, courts have routinely held that for some white collar offenses a short, or non-prison sentence, meets the goals of sentencing. *See U. S. v. Coughlin*, 2008 WL 313099, at *5 (W.D. Ark. February 1, 2008) (for white collar crime, probation and home detention

---

[1] Terry Carter, *Rakoff's stance on the SEC draws fire, praise - and change: The Judge Who Said No,* ABA Journal, Oct. 2013, at 53.

more effectively accomplish the goals of Section 3553 (a)(2) than imprisonment).  In upholding a deviation from the Guidelines where a district court imposed probation instead of jail time, the Supreme Court recognized that "[o]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty."  *Gall v. United States*, 552 U.S. 38, 48 (2007) (listing restrictions imposed on probationers, and quoting the Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13-14 (1957) ("Probation is not granted out of a spirit of leniency . . . probation is not merely letting an offender off easily" (internal citations omitted)); *See also Couglin* 2008 SL 313099 at *5 ("Home detention and probation can be severe punishments, hugely restrictive of liberty, highly effective in the determent of crime and amply retributive").  For many, these penalties are as damaging as a custodial sentence and achieve the goals of Section 3553(a)(2).  *Id.* at *6 ("the severely punitive quality of probation [is] capable of deterring corporate executives" from engaging in similar conduct again).  Offenders on supervised released, like *Gall:*

> may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking.

*Id.* at 48.  While a lengthy imprisonment is admittedly a more onerous form of punishment, it is not always the most effective for a particular defendant.

## **CONCLUSION**

For the reasons set forth above, the defendant, Charles W. Jones, respectfully submits that a split sentence of a period of incarceration and home electronic monitoring as a condition of supervised release will yield a sentence which is sufficient, but not greater than necessary, to accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553.

Respectfully submitted,

CHARLES W. JONES

By:_____/s/_____

Jeffrey A. Swartz, Esquire
Virginia State Bar ID 28143
Attorney for Defendant, Charles W. Jones
Swartz, Taliaferro, Swartz & Goodove
220 West Freemason Street
Norfolk, Virginia 23510
(757) 275-5000 Telephone
(757) 626-1003 Facsimile
Email: JSwartz@stsg-law.com

## CERTIFICATE OF SERVICE

I certify that on the 22nd day of February, 2023, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to:

Matthew Heck, Esquire
Assistant United States Attorney
Office of the United States Attorney
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office Number:  757-441-6331
Facsimile Number:  757-441-6689
Matthew.Heck@usdoj.gov

_____/s/_____
Jeffrey A. Swartz, Esquire
Virginia State Bar ID No. 28143
For Defendant, Charles W. Jones
Swartz, Taliaferro, Swartz & Goodove
220 West Freemason Street
Norfolk, Virginia 23510
(757) 275-5000 Telephone
(757) 626-1003 Facsimile
Email: JSwartz@stsg-law.com